**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, subscribing to Policy No. SUA WS20137-2006

Plaintiffs,

vs.

SANDRA MOYER, RICHARD MARTIN, TERRY PATTERSON, JR., YVONNE MATTHEWS, and HOME POINT FINANCIAL CORPORATION f/k/a MAVERICK FUNDING CORPORATION

Defendants.

**COMPLAINT FOR DECLARATORY JUDGMENT**

NOW COME Plaintiffs, Those Certain Underwriters at Lloyd's, London subscribing to Policy No. SUA WS20137-2006 ("Underwriters"), by and through the undersigned counsel, and herein submit their Complaint for Declaratory Judgment against Defendants, SANDRA MOYER, RICHARD MARTIN, TERRY PATTERSON Jr., YVONNE MATTHEWS, and HOME POINT FINANCIAL CORPORATION f/k/a MAVERICK FUNDING CORPORATION. In support thereof, Underwriters state as follows:

**STATEMENT OF THE CASE**

1. This action seeks a declaration that there is no coverage under Policy No. SUA WS20137-2006 (the "Policy") issued to HOME POINT FINANCIAL CORPORATION ("Home Point" or "Named Insured") by Underwriters for the lawsuit captioned *Sandra Moyer et al. v. Home Point Financial Corporation f/k/a Maverick Funding Corporation*, Case No. C-03-CV-20-003899, pending in the Circuit Court for Baltimore County, State of Maryland (the "Underlying Lawsuit"). A true and correct copy of the Policy is attached hereto as Exhibit A.

**PARTIES, JURISDICTION, AND VENUE**

2. Plaintiffs, Those Certain Underwriters at Lloyd's, London which subscribed to Policy Number SUA WS20137-2006, are Syndicate No. 1084[1] and Syndicate No. 3000[2] whose members or names are foreign companies whose principal places of business is London, England and are organized under the laws of England and Wales, located in the United Kingdom. Both Syndicates independently meet the amount in controversy for diversity of greater than $75,000.

3. Home Point is a New Jersey corporation engaged in the business of mortgage banking/mortgage brokering, with its principal place of business in Ann Arbor, Michigan. Homepoint is thus either a citizen of New Jersey or Michigan for purposes of diversity jurisdiction. Home Point was previously known as Maverick Funding Corporation ("Maverick").

4. Sandra Moyer is a resident and citizen of Texas.

5. Richard Martin is a resident of Carroll County, Maryland and a citizen of Maryland.

6. Terry Patterson, Jr. is a resident of Carroll County, Maryland and a citizen of Maryland.

7. Yvonne Matthews is a resident of Baltimore City, Maryland and a citizen of Maryland.

---

[1] Syndicate No. 1084 is otherwise referred to as Chaucer Syndicate and has 82.5% of the security for the Policy.

[2] Syndicate No. 3000 is otherwise referred to as Markel Syndicate and has 17.5% of the security for the Policy.

8. Underwriters only seek relief with respect to Home Point and no specific relief is sought with respect to any other Defendant. Underwriters will dismiss all other Defendants if they agree to be bound by the outcome of this matter.

9. This Court has jurisdiction over this matter under 28 U.S.C. §1332(a)(1) because there is complete diversity of citizenship between Underwriters, on the one hand, and Defendants, on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. Venue is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this dispute occurred in the District of Maryland.

11. Pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure, this Court has authority to declare the rights and obligations of the parties in relation to the terms and provisions of the Policy of insurance that Underwriters issued to Home Point.

## THE UNDERLYING LAWSUIT

12. On October 27, 2020, Sandra Moyer, Richard Martin, Terry Patterson, Jr., and Yvonne Mathews ("the Class Plaintiffs") filed a Class Action Complaint and Demand for Jury Trial in the Circuit Court for Baltimore County against Home Point. A true and correct copy of the Complaint is attached hereto as Exhibit B.

13. The Complaint alleges that the Class Plaintiffs are borrowers who have or had a residential mortgage loan originated and/or brokered by Home Point.

14. The Complaint alleges that Home Point's loan officers, agents, and other employees received and accepted illegal kickbacks from non-party All Star Title ("All Star") in exchange for the assignment and referral of residential mortgage loans, refinances, and reverse

mortgages for title and settlement services in violation of the Real Estate Settlement Practices Act ("RESPA") (12 U.S.C. § 2607(a)). (Exhibit B at ¶¶ 3, 17)

15. According to the Complaint, the Named Insured and All Star "laundered" the alleged kickbacks through various third-party marketing companies. (Exhibit B at ¶ 4)

16. Essentially, the Complaint alleges that the kickback scheme worked as follows: All Star would provide funding to third-party marketing companies to fund direct mailings to potential borrowers and/or telemarketing or "live transfer" calls; All Star would place its logo on the marketing materials to create the appearance that the marketing material provided some benefit to All Star; meanwhile, All Star's funding of the marketing material was contingent upon All Star receiving a certain amount of referrals from Home Point for title and settlement services; All Star would fund the alleged kickbacks by assessing false charges to borrowers and/or by fraudulently inflating legitimate charges for title and settlement services, including manipulating the Annual Percentage Rate ("APR"); Home Point would then allegedly conceal the fraudulent kickbacks by, *inter alia*, making various fraudulent representations on loan documents, including Truth In Lending Act ("TILA") disclosures, "Good Faith" estimates, and HUD-1's. (*See* Exhibit B at ¶¶ 6, 17-40-52, 82, 128-29)

17. The particular kickback agreement with All Star allegedly began as early as May 30, 2014 when a Home Point sales manager sent an email to an All Star marketing representatives requesting kickbacks for specific loans. (Exhibit B at ¶ 45)

18. Purportedly, there were 303 loans assigned to All Star in 2015 and 72 loans in 2016 which were part of the alleged kickback scheme.

19. The Complaint alleges that All Star has given kickbacks to numerous loan originators like Home Point.

20. The Complaint alleges that the kickback scheme may be ongoing, and that it was concealed and/or is still being concealed by Home Point. (Exhibit B at ¶¶ 75-78)

21. The Complaint seeks certification of a class consisting of borrowers on between 83 and 444 loans. (Exhibit B at ¶¶ 218-237)

22. As set forth in the Underlying Lawsuit, Plaintiffs claim they were injured by the alleged kickback scheme between All Star and Home Point, seek relief for Home Point's alleged violation of §8(a) of RESPA, and seek certification of a class consisting of borrowers on federally related mortgage loans originated or brokered by Home Point and for which All Star provided a settlement service between January 1, 2014 and December 31, 2016. (Exhibit B at ¶¶ 218-237)

23. Defendants seek damages in an amount equal to three times the amount paid for the allegedly unnecessarily increased settlement service charges. (Exhibit B)

**NOTICE AND RESERVATION OF RIGHTS**

24. On or about November 9, 2020, Underwriters received notice of the Underlying Lawsuit.

25. On December 4, 2020, Underwriters agreed in writing to defend Home Point from the Underlying Lawsuit subject to a reservation of rights, which defense has continued up to and through the filing of the instant lawsuit. A copy of Underwriters' December 4, 2020 reservation of rights letter is attached hereto as Exhibit C.

26. The December 4, 2020 reservation of rights letter issued by Underwriters contained, *inter alia*, an express reservation of rights to seek reimbursement of any and all attorneys' fees and costs paid by Underwriters for non-covered matters, as well as to cease paying for the defense of the Underlying Lawsuit should circumstances warrant such a decision.

## THE UNDERWRITERS' POLICY

27. On November 12, 2020, Underwriters issued a Mortgage Company Professional Liability Policy to Home Point Financial Corporation, Policy No. SUAWS20137-2006 for the Policy Period 10/15/2020 to 10/15/2021 (the "Policy"). (Exhibit A)

28. The Policy's Limit of Liability is $5,000,000 in the aggregate for each "Policy Period," inclusive of "Defense Costs," subject to a $100,000 retention for each Claim. (Exhibit A at pg. 10-11).

29. The Policy contains Retroactive Dates of: (a) October 18, 2007 for the first $1 million of limits (b) October 18, 2009 for the next $500,000 of limits, (c) August 15, 2015 for the next $1,500,000 of limits, and (d) August 15, 2016 for the next $2 million of limits. (Exhibit A at pg. 7)

30. The Insuring Agreement of the Policy provides:[3]

> **I. INSURING AGREEMENT**
>
> The Company will pay on behalf of the **INSURED LOSS** in excess of the Retention stated in Item 4 of the Declarations which the **INSURED** shall become legally obligated to pay as a result of any **CLAIM** first made against the **INSURED** during the **POLICY PERIOD** for a **WRONGFUL ACT** that occurred on or after the Retroactive Date stated in Item 6 of the Declarations.

(Exhibit A at p. 9)

31. The Policy defines "Insured" as follows:

> A. **"INSURED"** means the individual, partnership, corporation or other entity named in Item 1 of the Declarations and shall include all persons who were, are or shall become: 1) directors, officers, partners or employees of the **INSURED** while acting within the scope of their duties as such; and 2) the executors, heirs, legal representatives or assigns of each **INSURED** otherwise insured herein in the event of his or her death, incompetency, insolvency or bankruptcy.

[3] Bold language is bolded in the Policy.

(Exhibit A at p. 10)

32. The Policy defines "Wrongful Act" as follows:

> B. **"WRONGFUL ACT"** means any actual or alleged negligent act, negligent error or negligent omission committed by the **INSURED** solely in the performance of or failure to perform professional services for others in the **INSURED'S** Profession as stated in Item 1.A. of the Declarations.

(Exhibit A at p. 10)

33. The Policy defines "Defense Costs" as follows:

> E. **"DEFENSE COSTS"** means reasonable and necessary legal fees and expenses incurred with the approval of the Company in connection with the investigation, adjustment, settlement, defense or appeal of a **CLAIM** made against an **INSURED** for a **WRONGFUL ACT**, and shall include the cost of attachment or similar bonds. Payment of **DEFENSE COSTS** by the Company shall reduce, and may exhaust, the Limit of Liability under this Policy.
>
> "**DEFENSE COSTS**" shall not include salaries, wages, fees, overhead, overtime or benefit expenses incurred by or associated with the **INSUREDS**."

(Exhibit A at p. 11)

34. The Policy defines a "Claim" as follows:

> F. **"CLAIM"** means a written demand for money damages received by an **INSURED**, including service of suit and the institution of administrative or arbitration proceedings.

(Exhibit A at p. 11)

35. The Policy defines "Money Laundering" as follows:

> H. **"MONEY LAUNDERING"** means:
>
> (i) the concealment, or disguise, or conversion, or transfer, or removal of **CRIMINAL PROPERTY** (including concealing or disguising its nature, source, location, disposition, movement or ownership or any rights relating thereto); or
>
> (ii) the entering into or becoming in any way concerned in an arrangement which is known or suspected to facilitate (by

    whatever means) the acquisition, retention, use or control of **CRIMINAL PROPERTY** by or on behalf of another person; or

(iii) the acquisition, use or possession of **CRIMINAL PROPERTY**; or

(iv) any act which constitutes an attempt, conspiracy or incitement to commit any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii); or

(v) any act which constitutes aiding, abetting, counseling or procuring the commission of any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii).

(Exhibit A at p. 11-12)

36. Item 1.A. of the Declarations specifies the Insured's Profession as "MORTGAGE BANKER/MORTGAGE BROKER."

(Exhibit A at p. 7)

37. The Policy contains the following "DEFENSE AND SETTLEMENT" condition:

**II. DEFENSE AND SETTLEMENT**

Subject to Article V.B., the Company shall have the right and duty to defend any **CLAIM** against the **INSURED** to which this insurance applies, even if any of the allegations of the **CLAIM** are groundless, false or fraudulent.

The Company shall have the right to negotiate the settlement of any **CLAIM**, whether within or above the Retention, but the Company shall not commit the **INSURED** to any settlement without the **INSURED'S** consent, such consent not to be unreasonably withheld. The **INSURED** shall not admit liability for or settle any **CLAIM** or incur any **DEFENSE COSTS** without the written consent of the **COMPANY**, such consent not to be unreasonably withheld. If the **INSURED** refuses to consent to any settlement recommended by the Company and agreed to by the claimant, and elects to contest any **CLAIM** or continue any legal proceedings in connection with such **CLAIM**, then, subject to the Limit of Liability of this Policy, the Company's liability for the **CLAIM** shall be limited to the total of: (1) the amount in excess of the Retention which the Company would have contributed to the settlement had the **INSURED** consented to such settlement plus the **DEFENSE COSTS** incurred up to the date of such refusal and (2) 25% of any covered **LOSS** in excess of the amount in (1). The Company shall not indemnify the **INSURED** for the remaining 75% of any covered **LOSS** in excess of the amount in (1).

(Exhibit A at p. 7-8)

38. The Policy also contains the following exclusions:

> **IV. EXCLUSIONS**
>
> This Policy does not apply to **LOSS** in connection with any **CLAIM**:
>
> * * *
>
> S. based upon or directly or indirectly arising out of or resulting from any actual or alleged **MONEY LAUNDERING** or any actual or alleged act which is in breach of and/or constitutes an offence under any money laundering legislation (or any provisions and/or rules or regulations made by any regulatory body or authority thereunder);
>
> T. based upon or directly or indirectly arising out of or resulting from any actual or alleged advertising or solicitation activities of an **INSURED**;

(Exhibit A at p. 16)

**<u>COUNT I – DECLARATORY JUDGMENT</u>**
**(No Duty to Defend or Indemnify – Underlying Lawsuit)**

39. Underwriters incorporate by reference the allegations of Paragraphs 1 through 38 above as though fully set forth herein.

40. The **INSURING AGREEMENT** of the Policy extends coverage only for **CLAIMS** made against an Insured for a **WRONGFUL ACT**.

41. **WRONGFUL ACT** is defined by the Policy as "any actual or alleged negligent act, negligent error or negligent omission committed by the **INSURED** solely in the performance of or failure to perform professional services for others in the **INSURED'S** Profession as stated in Item 1.A. of the Declarations."

42. The Underlying Lawsuit alleges an intentional and fraudulent kickback scheme in violation of RESPA, and therefore does not allege any negligent act, negligent error or negligent omission by any Insured.

43. The Underlying Lawsuit's allegations of a kickback scheme also do not involve any negligent act, negligent error, or negligent omission committed by any **INSURED** "solely in the performance of or failure to perform professional services for others in the **INSURED'S** Profession as stated in Item 1.a. of the Declarations," *i.e.*, Mortgage Banker/Mortgage Broker.

44. The Underlying Lawsuit therefore does not trigger coverage under the **INSURING AGREEMENT** of the Policy because it does not involve any **WRONGFUL ACT**.

45. The Underlying Lawsuit's allegations of a kickback scheme also involve the acquisition, use, or possession of **CRIMINAL PROPERTY**; an act which constitutes an attempt, conspiracy, or incitement to commit such act(s); and/or an act which constitutes aiding, abetting, counseling, or procuring the commission of any such act(s).

46. Kickbacks by their very nature are **CRIMINAL PROPERTY** because a kickback is property which constitutes a benefit obtained from or as a result of or in connection with criminal conduct or represents a benefit (in whole or part and whether directly or indirectly) which the **INSURED** (or any person or entity acting on their behalf) knows or suspects or reasonably should have known or suspected constitutes or represents such a benefit.  12 U.S.C. § 2607.

47. Coverage for the Underlying Lawsuit is therefore excluded under the Policy based on the **MONEY LAUNDERING** exclusion at Section IV.S. of the Policy.

48. The Underlying Lawsuit further alleges that Home Point laundered kickbacks through third-party marketing companies to conceal the illegal kickbacks and the kickback scheme, and in doing so, sent sham solicitations to prospective borrowers.

49. Coverage is therefore excluded for the Underlying Lawsuit pursuant to Section IV.T. of the Policy because the Underlying Lawsuit is based upon or directly or indirectly arising

out of or resulting from any actual or alleged advertising or solicitation activities of an **INSURED**.

50. Underwriters timely and specifically reserved on its right to recover all defense and other expenses provided to Home Point in the defense of the Underlying Litigation should facts demonstrate that the matter is not covered. Since Underwriters timely reserved on this right, they are entitled to reimbursement of all such fees paid to date.

WHEREFORE, as to Count I, Underwriters pray for judgment as follows:

a. Declaring that Underwriters have no duty to defend or indemnify Home Point under the Policy with respect to the Underlying Lawsuit;

b. Declaring that Underwriters are entitled to recoup any Defense Costs incurred and/or paid for the defense of Home Point in the Underlying Lawsuit;

c. Awarding Underwriters all Defense Costs paid for the defense of Home Point in the Underlying Lawsuit; and

d. Awarding Underwriters such other and further relief as the Court may deem appropriate and just.

Respectfully submitted,

*THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON subscribing to Policy No. SUA WS20137-2006*

By: */s/ James P. Steele*
James P. Steele, 13484
Carr Maloney P.C.
2000 Pennsylvania Avenue, NW, Suite 8001
Washington, D.C.  20006
(202) 310-5500 (Telephone)
(202) 310-5555 (Facsimile)
james.steele@carrmaloney.com
Attorney for Plaintiff

Edward Fitzsimmons Dunne (*pro hac vice* pending)
**KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC**
200 S. Wacker Drive, Suite 2550
Chicago, IL 60606
Telephone: (312) 431-3700
Facsimile: (312) 431-3670
efdunne@karballaw.com
Attorneys for Plaintiff
*Those Certain Underwriters at Lloyd's, London subscribing to Policy No. SUA WS20137-2006*